IN THE COURT OF APPEALS OF TENNESSEE
AT MEMPHIS
FEBRUARY 19, 2009 Session

# DEBORAH MITCHELL, As Executrix of Gaynell Metts, Deceased v. KINDRED HEALTHCARE OPERATING, INC., ET AL.

Direct Appeal from the Circuit Court for Shelby County
No. CT-005450-05      Kay S. Robilio, Judge

No. W2008-01643-COA-R3-CV - Filed June 17, 2009

This case involves an arbitration agreement executed when a resident entered a nursing home. The resident's daughter signed the arbitration agreement after telling nursing home employees that she had power of attorney. The daughter later sued the nursing home on behalf of her mother, and the nursing home sought to enforce the arbitration agreement. The daughter then claimed that she was not actually authorized to act as her mother's attorney-in-fact. The trial court agreed and refused to enforce the arbitration agreement. On appeal, the nursing home contends that the daughter was authorized to sign the arbitration agreement on behalf of her mother due to a document which, according to the nursing home, effectively granted the daughter power of attorney. We affirm the trial court's finding that the daughter lacked authority to execute the arbitration agreement on behalf of her mother.

Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which HOLLY M. KIRBY, J. and J. STEVEN STAFFORD, J., joined.

David J. Ward, T. Ryan Malone, Jill Jensen Thrash, Chattanooga, TN, for Appellants

Cameron C. Jehl, Deborah Truby Riordan, Carey L. Acerra, Little Rock, AR, for Appellee

**OPINION**

# I. FACTS & PROCEDURAL HISTORY

Gaynell Metts ("Decedent") was admitted to Cordova Rehabilitation and Nursing Center ("Cordova") for walking rehabilitation on August 12, 2004. Decedent was 82 years old and had been diagnosed with Alzheimer's Disease several years earlier. She had been living with her daughter, Deborah Mitchell ("Daughter"), for the past six years.

Five days after Decedent was admitted to Cordova, Daughter was asked by Cordova personnel to sign admission documents for Decedent, which included an "Alternative Dispute Resolution Agreement Between Resident and Facility," (hereinafter, "ADR Agreement"). Daughter told Cordova employees that she "had power of attorney," but she did not provide any documentation to support her claim. Daughter signed the admission documents, including the ADR Agreement, on August 17, 2004.

On October 14, 2005, Daughter filed this lawsuit, as next friend of Decedent, against Cordova and related entities,[1] alleging abuse and neglect and asserting various causes of action. Daughter's complaint asserted that, at all times during her residency at Cordova, Decedent was "incapable of taking care of herself[,] incapable of attending to any business," and "of unsound mind," within the meaning of Tennessee Code Annotated section 28-1-106, which provides for the tolling of the statute of limitations for persons who are "of unsound mind."

Cordova filed a "Motion to Dismiss or, in the Alternative, for Summary Judgment, and to Stay All Proceedings, Including Discovery," claiming that Daughter's complaint was barred by the ADR Agreement. The parties subsequently engaged in discovery regarding the execution of the ADR Agreement.

During her deposition, Daughter testified that Decedent originally granted her power of attorney in 1989 after Decedent's husband passed away. Daughter produced the first page of a document entitled, "Durable Power of Attorney," but she could not locate the subsequent pages. This document stated that Decedent appointed Daughter as her attorney-in-fact under the Uniform Durable Power of Attorney Act,[2] and it set forth detailed instructions authorizing Daughter to execute deeds, mortgages or encumbrances with respect to Decedent's property; to collect monies, goods, and things due to Decedent; to perform Decedent's banking business and transactions; to access Decedent's safe deposit box; to pay money or taxes owing by Decedent; and to borrow money upon such terms as Decedent's attorney deemed advisable. The powers granted to Daughter extended on to the following pages, but again, they are not included in the record. Although the first page of the document does not include Decedent's signature, Daughter testified that Decedent signed

---

[1] The other defendants are owners, operators, or administrators of Cordova. For ease of reference, we will refer to the defendants collectively as "Cordova."

[2] Although the power of attorney document cited Tenn. Code Ann. § 34-5-101, *et seq.*, Tennessee's Uniform Durable Power of Attorney Act is located at Tenn. Code Ann. § 34-6-101, *et seq.* (2007).

its signature page. However, Daughter also testified that, for some unknown reason, Decedent later revoked this power of attorney and granted power of attorney to Decedent's son, Richard L. Metts. Then, on March 14, 2000, Decedent executed another document, which provided:

> **Revocation Of Power Of Attorney**
> KNOW ALL MEN BY THESE PRESENTS that I, [Decedent], of Memphis, Shelby County, Tennessee do hereby revoke any and all previous grants of power of attorney. Specifically I revoke any grant of power of attorney to Richard Lee Metts on the 13th day of January 1999. I also would like to make [Daughter] my power of attorney.

This document was signed by the Decedent, notarized, and signed by two witnesses. Subsequent to Decedent's residency at Cordova, on June 27, 2005, she executed yet another document, which stated:

> I, [Decedent], give [Daughter], power of attorney over all my personal business and give her authority to take [care] of all business and act in my behalf on any and all things.

This document was handwritten, signed by Decedent, and notarized.

Following discovery, Daughter filed a response to Cordova's motion to dismiss or for summary judgment, arguing, among other things, that Daughter did not have the requisite authority to sign the ADR Agreement on behalf of Decedent.[3] Daughter claimed that the 2000 "Revocation Of Power Of Attorney" document did not, itself, grant her power of attorney. In response, Cordova argued that the 2000 "Revocation Of Power Of Attorney" document was effective to name Daughter as Decedent's attorney-in-fact, and therefore, Daughter was acting with actual authority when she executed the ADR Agreement. Alternatively, Cordova argued that "exigent circumstances" existed which gave Daughter apparent authority to execute the ADR Agreement on behalf of Decedent.

On June 20, 2008, the trial court entered an order denying Cordova's motion to dismiss or for summary judgment, finding insufficient evidence to support a finding that Daughter was authorized to sign the ADR Agreement. Cordova timely filed a notice of appeal.

## II. ISSUES PRESENTED
On appeal, Cordova states the issue as follows: "Whether the trial court erred in declining to enforce the ADR Agreement between the parties." Daughter contends that the trial court correctly found the ADR Agreement unenforceable because (i) Daughter lacked authority to bind Decedent to the ADR Agreement; (ii) the ADR Agreement is unenforceable as against public policy; and/or

---

[3] Decedent died on March 12, 2006, and an order was entered substituting Daughter, as executrix of Decedent's estate, as the proper plaintiff.

(iii) Cordova breached its fiduciary duty to Decedent. For the following reasons, we affirm the decision of the circuit court.

## III. STANDARD OF REVIEW

On appeal, this Court reviews a grant or denial of a motion to compel arbitration under the same standards that apply to bench trials. *Cabany v. Mayfield Rehab. & Special Care Ctr.*, No. M2006-00594-COA-R3-CV, 2007 WL 3445550, at \*3 (Tenn. Ct. App. Nov. 15, 2007) (citing *Hubert v. Turnberry Homes, LLC*, No. M2005-00955-COA-R3-CV, 2006 WL 2843449, at \*2 (Tenn. Ct. App. Oct. 4, 2006); *Spann v. Am. Express Travel Related Servs. Co.*, 224 S.W.3d 698, 706-707 (Tenn. Ct. App. 2006)). We note that in this case, Cordova sought enforcement of the ADR Agreement by filing a "Motion to Dismiss or, in the Alternative, for Summary Judgment, and to Stay All Proceedings, Including Discovery." The defendant nursing home in *Barbee v. Kindred Healthcare Operating, Inc.*, No. W2007-00517-COA-R3-CV, 2008 WL 4615858, at \*2 (Tenn. Ct. App. Oct. 20, 2008), similarly filed "a motion to dismiss, or, in the alternative, for summary judgment and to stay all proceedings, including discovery," seeking to enforce an arbitration agreement. In discussing our standard of review on appeal, we explained:

> Here, the Kindred Defendants sought enforcement of the Arbitration Agreement by a motion for summary judgment, asking for dismissal of the complaint. The trial court considered not only the pleadings, but also the depositions and other discovery in dismissing the action and compelling arbitration. The fact that the trial court considered matters outside the scope of the pleadings did "not convert the motion to compel arbitration into a motion for summary judgment." *Raines v. Nat'l Heath Corp.*, No. M2006-1280-COA-R3-CV, 2007 WL 4322063, at \*4 (Tenn. Ct. App. Dec. 6, 2007). "[A] proper motion to compel arbitration is not even a true motion to dismiss." *Id.* (citing *Thompson v. Terminix Int'l Co.*, No. M2005-02708-COA-R3-CV, 2006 WL 2380598, at \*3 (Tenn. Ct. App. Aug. 16, 2006)). "The correct procedure to be followed by the trial court upon a motion to compel arbitration, therefore, is, if it determines the matter is subject to arbitration, to enter an order compelling arbitration of that matter and staying the matter." *Id.* (quoting *Thompson*, 2006 WL 2380598, at \*3). We review the enforcement of an arbitration agreement de novo. *Rosenberg v. BlueCross BlueShield of Tenn., Inc.*, 219 S.W.3d 892, 903 (Tenn. Ct. App. 2006) (citing *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 497 (6th Cir. 2004)). A presumption of correctness is afforded to the trial court's findings of fact, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *T.R. Mills Contractors, Inc. v. WRH Enter., LLC*, 93 S.W.3d 861, 864 (Tenn. Ct. App. 2002). However, there is no presumption of correctness afforded to a trial court's conclusions of law. *T.R. Mills Contractors, Inc.*, 93 S.W.3d at 864 (citations omitted).

*Id.* at \*5.

## IV. DISCUSSION

### A. Daughter's Authority

On appeal, Cordova argues that Daughter "had actual authority to execute the ADR Agreement on behalf of her mother by virtue of the Power of Attorney dated March 14, 2000." As the proponent of the ADR Agreement, Cordova has the burden of establishing that Daughter had authority to sign the agreement on Decedent's behalf. *See Barbee*, 2008 WL 4615858, at *12 (citing *John J. Heirigs Const. Co. v. Exide*, 709 S.W.2d 604, 608 (Tenn. Ct. App. 1986)).

"[P]owers of attorney are to be construed in accordance with the rules for the interpretation of written instruments generally; in accordance with the principles governing the law of agency, and, in the absence of proof to the contrary, in accordance with the prevailing laws relating to the act authorized." *Owens v. Nat'l Health Corp.*, 263 S.W.3d 876, 884 (Tenn. 2007) (quoting 3 Am. Jur. 2d *Agency*, § 27 (2007)) (emphasis omitted). In *Tennessee Farmers Life Reassurance Co. v. Rose*, 239 S.W.3d 743, 749-50 (Tenn. 2007), the Tennessee Supreme Court provided a thorough explanation of principles relevant to powers of attorney:

> The execution of a power of attorney creates a principal-agent relationship. Unless otherwise constrained by law or public policy, a person executing a power of attorney may empower his or her agent to do the same acts, to make the same contracts, and to achieve the same legal consequences as the principal would be personally empowered to do.
>
> The authority of the agent may be couched in general terms and may be as broad as the principal decides to make it. In the absence of specific legal requirements, a power of attorney may be in any form and may be executed in accordance with any recognized common-law method for executing written instruments. The language of a power of attorney determines the extent of the authority conveyed. The more specific a power of attorney is concerning the performance of particular acts, the more the agent is restricted from performing acts beyond the specific authority granted.
>
> A power of attorney is a written instrument that evidences to third parties the purpose of the agency and the extent of the agent's powers. It should be construed using the same rules of construction generally applicable to contracts and other written instruments, except to the extent that the fiduciary relationship between the principal and the agent requires otherwise.
>
> The legal effect of a written contract or other written instruments is a question of law. Thus, powers of attorney should be interpreted according to their plain terms. There is no room for the construction of a power of attorney that is not ambiguous or uncertain, and whose meaning and portent are perfectly clear. However, when the meaning of a power of attorney is unclear or ambiguous, the intention of the principal, at the time of the execution of the power of attorney, should be given effect. While the parol evidence rule applies, the courts may arrive at the meaning

of a power of attorney by considering the five factors identified in Restatement (Second) of Agency section 34.[4]

A formal written instrument that has been carefully drawn can be assumed to spell out the intent of the author with a high degree of particularity. Thus, an instrument like a power of attorney should be subjected to careful scrutiny in order to carry out the intent of the author and no more. There should be neither a "strict" nor a "liberal" interpretation of the instrument, but rather a fair construction that carries out the author's intent as expressed in the instrument.

(citations and original footnotes omitted).

Here, the single document relied upon by Cordova as the basis of Daughter's authority was entitled, "Revocation Of Power Of Attorney," and it stated, in relevant part, "I also would like to make [Daughter] my power of attorney." Because we find this document unclear or ambiguous, we will consider evidence of Decedent's intention at the time of its execution.[5] During her deposition, Daughter was questioned by counsel for Cordova regarding the "Revocation Of Power Of Attorney" document as follows:

> Q. Did you and your mother ever discuss what authority she was giving you by naming you power of attorney in that document?
> A. No, sir.
> Counsel for Daughter: Object to form.
> Q. Was that a no?
> A. No, sir.
> Q. Did you know that your mother was giving you a power of attorney when she revoked the power of attorney to your brother?
> Counsel for Daughter: Object to the form.
> A. Yes, sir.
> Q. Did you discuss it before she signed the document?

---

[4] The five factors listed in Restatement (Second) of Agency section 34 include:
(a) the situation of the parties, their relations to one another, and the business in which they are engaged;
(b) the general usages of business, the usages of trades or employments of the kind to which the authorization relates, and the business methods of the principal;
(c) facts of which the agent has notice respecting the objects which the principal desires to accomplish;
(d) the nature of the subject matter, the circumstances under which the act is to be performed and the legality or illegality of the act; and
(e) the formality or informality, and the care, or lack of it, with which an instrument evidencing the authority is drawn.

[5] We note that neither party objected to the trial court's consideration of testimony regarding Decedent's intention and the circumstances surrounding the execution of this document, and both parties cite such testimony in their briefs on appeal.

A. No, sir.
Q. How did you know?
A. She told me she was.
Q. Is it fair to say that she told you she was going to make you power of attorney but didn't go into the specifics of how or when?
A. Right.
Q. Did she ever tell you what kind of decisions she wanted you to make on her behalf?
A. No, sir.
Q. Did she ever identify any specific decisions that you were not allowed to make on her behalf?
A. No, sir.

In sum, although Decedent told Daughter of her intention to name Daughter power of attorney, she did not specify how or when she would do so, and she never discussed any authority as being presently granted by the "Revocation Of Power Of Attorney" document. In addition, the document itself does not address the extent of any powers conveyed. We recognize that Daughter told Cordova employees that she "had power of attorney." However, there is no indication that *Decedent* ever treated the "Revocation Of Power Of Attorney" document as a present grant of power of attorney to Daughter. Decedent's nursing home admission assessment, which indicates that it was prepared with the participation of "family" *and Decedent*, did not list anyone as holding power of attorney for Decedent. In a section of the assessment form designated "Responsibility/Legal Guardian," there are boxes to be marked to indicate the type of situation applicable to a resident. Specifically, the form states, "Check all that apply," and it lists the following options: (1) Legal guardian; (2) Other legal oversight; (3) Durable power of attorney/healthcare; (4) Durable power of attorney/financial; (5) Family member responsible; (6) Patient responsible for self; and (7) None of the above. Decedent's admission assessment is marked, "Patient responsible for self."

Cordova also argues that, even if the power of attorney was ineffective, Daughter nevertheless possessed actual authority to execute the ADR Agreement on behalf of Decedent because Decedent intended for Daughter to act on her behalf. However, as support for this argument, Cordova only points to Decedent's statement, in the "Revocation Of Power Of Attorney" document, that she "would like to make [Daughter] my power of attorney," her later statement to Daughter about her intention to name her power of attorney, and Daughter's belief that she had authority to sign the documents.

The Court considered a similar argument and factual situation in ***Hendrix v. Life Care Centers of America, Inc.***, No. E2006-02288-COA-R3-CV, 2007 WL 4523876 (Tenn. Ct. App. Dec. 21, 2007), where another daughter signed a nursing home arbitration agreement on behalf of her mother. In that case, the mother had previously executed a document naming the daughter power of attorney in the event that she became unable to make her own medical decisions. ***Id.*** at *4. However, when the daughter executed the arbitration agreement, the mother was not incapacitated to the point of being unable to make her own medical decisions. ***Id.*** at *5. Thus, the power of

attorney was not legally effective. *Id.* The nursing home argued that, regardless of the effectiveness of the power of attorney document, the daughter still had actual authority to sign the arbitration agreement on behalf of her mother. *Id.* In support of that argument, the nursing home pointed to evidence that was "inextricably intertwined with the power-of-attorney issue," including the daughter's belief that she had authority pursuant to the power of attorney document. *Id.* The Court found no evidence of a separate agency relationship that could be analyzed independently of the power of attorney issue, stating:

> Daughter's testimony establishes only that she believed she had the authority to act on Mother's behalf because of the POA document – the very document that we have already found to be ineffective for purposes of this case. Daughter's "understanding" of the POA does not alter its legal effect, and her erroneous beliefs about the scope of her attorney-in-fact powers certainly cannot create an independent agency relationship, separate and apart from the very document she was testifying about.
> . . . Whatever Daughter might have believed, nothing in the record convinces us that she actually was expressly authorized to sign these documents. . . .
> . . . Nursing Home is not entitled, as it suggested on oral argument, to simply "rely upon someone who comes in and says, 'I'm the POA. I have the authority. Here's the Power of Attorney. Let me sign the documents.'" By signing the arbitration agreement, Daughter sought to bind Mother to a course of action that altered her legal rights. Unless Mother's power-of-attorney documents were in effect at the time – and we have already affirmed the trial court's ruling that they were not – Daughter did not have the power to do this. That her retrospective powerlessness now accrues to her own benefit is an odd quirk of this case's facts, and is undoubtedly frustrating to Nursing Home, but it does not alter the pertinent legal doctrines nor the proper outcome of this case. The arbitration agreement was not validly agreed to by Mother, and therefore it cannot bind her or her estate.

*Id.* at *5-6. We similarly find no evidence of an independent agency relationship apart from the "Revocation Of Power Of Attorney" document, which we have already found ineffective. There is no evidence in this case that Decedent expressly authorized Daughter to sign the ADR Agreement or other admission documents, as Daughter testified that she and Decedent did not discuss her admission to the nursing home or the signing of any papers for her rehabilitation. Daughter said that she never discussed the ADR Agreement with Decedent.

As previously noted, in the trial court, Cordova alternatively argued that Daughter possessed apparent authority to execute the ADR Agreement on behalf of Decedent due to exigent circumstances. Cordova initially presented this same argument on appeal, but in light of this Court's opinion in *Barbee*, 2008 WL 4615858, at *9, in which we found "no support . . . for the proposition that apparent authority for a principal/agent relationship can be created by 'exigent circumstances,'" Cordova explicitly withdrew its apparent authority argument in its reply brief. Cordova then presented an alternative argument, in its reply brief, regarding whether Daughter possessed implied actual authority to execute the ADR Agreement. However, from our review of the record, this

argument was never raised in the trial court.  Therefore, we will not address it on appeal.  *See* ***Black v. Blount***, 938 S.W.2d 394, 403 (Tenn. 1996) ("Under Tennessee law, issues raised for the first time on appeal are waived.")

## V.  CONCLUSION

For the aforementioned reasons, we find that Cordova has failed to carry its burden of proving that Daughter had authority to execute the ADR Agreement on Decedent's behalf.  Thus, we need not address the other issues raised by Daughter regarding the enforceability of the ADR Agreement.

We affirm the decision of the circuit court.  Costs of this appeal are taxed to the appellants, Kindred Healthcare Operating, Inc.; Kindred Healthcare, Inc; Kindred Nursing Centers East, LLC; Kindred Hospitals Limited Partnership; Kindred Nursing Centers Limited Partnership d/b/a Cordova Rehabilitation and Nursing Center; Renee Tutor, in her capacity as Administrator of Cordova Rehabilitation and Nursing Center, and their surety, for which execution may issue if necessary.

                                      _____

ALAN E. HIGHERS, P.J., W.S.